**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

———————————————————————
                                :

TRENTON METROPOLITAN AREA    :
      LOCAL OF THE AMERICAN    :
      POSTAL WORKERS UNION,    :
      AFL-CIO                      :     CIVIL ACTION NO. 06-2319 (JAP)
                                  :
            Plaintiff,        :
      v.                           :     **OPINION**
                                :
UNITED STATES POSTAL        :
      SERVICE,                  :
                                :
           Defendant.      :
———————————————————————:

APPEARANCES:

Mark E. Belland, Esq.
Jeffrey R. Caccese, Esq.
Brett I. Last, Esq.
O'Brien, Belland & Bushinsky, LLC
2111 New Road, Suite 101
Northfield, New Jersey 08225
     *Attorneys for Plaintiff*

Christopher J. Christie, Esq.
United States Attorney
Colette R. Buchanan, Esq.
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
     *Attorneys for Defendant*s

PISANO, District Judge.

       This action arises from a Complaint brought pursuant to the Postal Reorganization Act,

39 U.S.C. § 1208(b), seeking to enforce a "Pre-Arbitration Settlement Agreement" ("Settlement

Agreement") entered into by Plaintiff Trenton Metropolitan Area Local of the American Postal Workers Union ("APWU"), AFL-CIO ("Trenton Metro") and Defendant United States Postal Service ("USPS"). That Settlement Agreement was entered into in accordance with a collective bargaining agreement between the parties. Currently before the Court are cross-motions for summary judgment. For the reasons set forth herein, the Court grants in part Trenton Metro's motion for summary judgment in respect of enforcing the Settlement Agreement and denies in part in respect of its claim for monetary damages. In addition, the Court grants in part the USPS's cross-motion for summary judgment in respect of Trenton Metro's claim for monetary damages, and denies in part as to its claim that the Settlement Agreement is not enforceable.

I.      BACKGROUND

This action arises from a dispute over the staffing of members of the mail processing clerk craft ("clerks") on a mail sorting machine, the Automated Flat Sorter Machine 100 ("AFSM-100"). Trenton Metro, a labor union, represents those clerks employed by USPS at its Trenton, New Jersey facility. (Michael Gallagher Declaration ("Gallagher Decl.") ¶ 4). At that facility, the USPS also employs members of the mail handler craft ("mail handlers") who are represented by a separate labor union, the National Postal Mail Handlers Union ("NPMHU"). (Gallagher Decl. ¶ 7).

The Installation Inventory of Mail Processing Operations ("Inventory"), an agreement between the USPS, Trenton Metro, and NPMHU, memorializes jurisdictional work assignments for both clerks and mail handlers. (Gallagher Decl. ¶ 7-8, Ex. B). A Trenton Inventory dated June 4, 2001 assigned five clerks to "load and sweep from AFSM[-]100[;] retrieve mail to be run on AFSM[-]100 from the flat storage area at the south end of the AFSM[-]100[;] remove the flat

-2-

tubs from the extendable buffer/conveyor and place them into mail transport equipment for either dispatch or transport to another operation."  (Gallagher Decl. Ex. A).  That Inventory specifies that the machine requires "three (3) loaders [and] two (2) sweepers[,]" and, when "heavy volume" requires a sixth person on the machine, "that person would normally be a mail handler." (Gallagher Decl. Ex. A).

On November 14, 2003, representatives of the USPS's Trenton facility, Trenton Metro, and NPMHU executed a Memorandum of Understanding, in which the parties "agree[d] that all present work assignments are deemed right and just and the installation inventory will remain intact."  (William Lewis Affidavit Feb. 13, 2008 ("Lewis Aff. II") Ex. C).  It further provided that the "[Regional Instruction 399-Dispute Resolution Procedures ("]RI[-]399["]] memorandum will govern all future disputes."  (Lewis Aff. II Ex. C).

RI-399 is a separate Memorandum of Understanding entered into by the USPS, Trenton Metro, and NPMHU on April 16, 1992 and sets forth procedures for "resolving jurisdictional disputes" over work assignments.[1]  (Gallagher Decl. Ex. D at 1).  This Memorandum sets forth that "[m]anagement will not engage in operational changes for the purpose of affecting the jurisdictional assignments in a facility."  (Gallagher Decl. Ex. D at 4).  RI-399 states:

> It is the intent of the parties to continue craft jurisdictional assignments which are not already the subject of a grievance . . . .  To the extent that operational changes are made that may result in the reassignment of functions from one craft to another management must present and discuss such changes with the LDRC thirty (30) days prior to the effective date of the operational change.  Within 14 days from the effective date, the adversely impacted union may appeal the operational change to

---

[1]  "A jurisdictional dispute is one in which the grievant union seeks either to change what it acknowledges to be an established craft assignment in the other union's favor, or to determine an undecided craft assignment[.]"  *Am. Postal Workers Union, AFL-CIO v. Nat'l Postal Mail Handlers Union*, 2007 WL 581921, *1 n.4 (D.D.C. Feb. 21, 2007).

> arbitration. A tripartite arbitration shall be heard within sixty (60) days of the effective date of the operational change in order to resolve any jurisdictional disputes. The issue to be decided in cases involving operational changes will be whether the proposed change is consistent with RI-399 and/or the intent of this Agreement.

(Gallagher Decl. Ex. D at 4).

On March 22, 2003, Trenton Metro "filed a grievance because mail handlers were being assigned to clerk craft positions on the AFSM in contravention of the June 4, 2001 Inventory." (Lewis Aff. II ¶ 12). The USPS and Trenton Metro settled that grievance on October 28, 2005 in a Pre-Arbitration Settlement Agreement. (Gallagher Decl. Ex. B). That Agreement provides:

> The Trenton inventory signed on June 6, 2001 . . . designates work performed on the AFSM (see inventory) clerk work up to 5 Mail Processors per machine. The inventory allows a M[ail ]H[andler] to be the sixth person during heavy volume. If reduction in work occurs, personnel will be moved in reverse order. The result is the Mail Processors will not fall below the 5 required positions prior to the extra Mail Handler being taken off the operation.

(Gallagher Decl. Ex. B). Trenton Metro also agreed to withdraw its pending grievances relating to the assignment of work on the AFSM-100. (Gallagher Decl. Ex. B).

On December 23, 2004—during the pendency of the underlying grievance, but before the parties entered into the Settlement Agreement—the USPS notified the President of the National APWU that the USPS planned to modify the AFSM-100 machine with "an automatic induction system." (Lewis Aff. II Ex. B). In that notification, the USPS stated that the "modification will automate the machine feeding task and will also mechanize current related manual mail preparation and transport activities." (Lewis Aff. II Ex. B). The USPS further noted that the changes "will reduce the staffing requirements for the AFSM[-]100 and for flat mail preparation." (Lewis Aff. II Ex. B). Specifically, the USPS expected the modifications to impact the clerk and mail handler positions, such that "there will no longer be a requirement for feed

-4-

operators[]" and "will eliminate the need for flat mail preparation into Flat Mail Carts and other containers." (Lewis Aff. II Ex. B). Overall, the USPS advised that the modifications ultimately served to save net work hours, including "a reduction of the AFSM[-]100 operating crew, [a] decrease[] in operation run times, and efficiencies in the preparation activities." (Lewis Aff. II Ex. B). Finally, the USPS stated that "[b]reak down of the impact to clerks versus mail[]handlers must be determined at the local level due to site differences in preparation operations and other operating constraints." (Lewis Aff. II Ex. B).

A February 17, 2005 letter from the USPS to the National APWU similarly stated that each district and area will determine the employee impact at each site. (Lewis Aff. II Ex. C). This information was reconveyed to Trenton Metro, via APWU's Eastern Regional Coordinator, on June 17, 2005 from the Northeast Regional Coordinator of the APWU. (Lewis Aff. II Ex. D).

Subsequently, on February 8, 2006, the USPS discussed the specifics of the modifications to the AFSM-100 and their impact on the staffing of the machine. (Lewis Aff. II Ex. F). The enhancements fall into two categories: the Automated Induction ("AI") System and the Automatic Tray Handling System 100 ("ATHS"). (Lewis Aff. II Ex. F at 1). According to the USPS, machines with the AI modification require three work stations: the "Load Station," occupied by one employee to load the machine; the "Prep Station," occupied by "up to four employees" to prepare and process bundled mail, flat mail trays, and loose mail pieces; and the "Feed Station," occupied by one employee to tend to mail on the feeder ledge and clear jams. (Lewis Aff. II Ex. F at 1-2). Due to these changes, the USPS determined that "[t]he primary jurisdiction of the Load [S]tation is the mail[]handler craft[; t]he primary jurisdiction of the Prep [S]tation is the mail[]handler craft[; and] the primary jurisdiction of the Feed [S]tation is the

clerk craft." (Lewis Aff. II Ex. F at 3).

The ATHS enhancement replaced the "work of removing full trays of mail from the AFSM-100 with empty trays." (Lewis Aff. II Ex. F at 2). The USPS explained that staffing on machines with the ATHS modification "requires the operator to load empty trays and clear jams[,]" and to "remov[e] full flat mail trails from the discharge conveyors . . . ." (Lewis Aff. II Ex. F at 2). Based on this change, the USPS determined that the "primary jurisdiction of the employee operating the ATHS is the mail[]handler craft." (Lewis Aff. II Ex. F at 3). Finally, the USPS also determined that four clerks should operate those AFSM-100 machines that receive the ATHS modification, but not the AI enhancement. (Lewis Aff. II Ex. F at 3).

On May 18, 2006, Trenton Metro filed the present action, seeking the Court to enforce the terms of the Settlement Agreement. Trenton Metro specifically alleges that the USPS "has begun to staff the AFSM with five (5) employees, one which is a 'handler.'" (Complaint ("Cmplt.") ¶ 10). It further claims that the USPS violated the Settlement Agreement "by entering into a 'Letter of Agreement' [dated May 10, 2006] with the [NPMHU], Local 308, AFL-CIO, which, in effect, purports to give all work on the AFSM to 'handlers[.]'"[2] (Cmplt. ¶ 11). Consequently, Trenton Metro seeks the Court to enjoin the USPS "from in any manner transferring bargaining unit work that would be in contravention of the Settlement Agreement[,]" and to order the USPS "to make each and every bargaining unit member that has been deprived of work by virtue of the [USPS]'s disavowal of the Settlement Agreement[] whole by reinstatement, payment of back pay, benefits, and the like." (Cmplt. ¶ B-C).

─────────────────────

[2]  The parties have not provided this "Letter of Agreement" in the record on these cross-motions for summary judgment. Thus, the Court does not consider this Letter here.

Trenton Metro now moves for summary judgment on the basis that there is no dispute of material fact that the USPS is in violation of the Settlement Agreement, which the Court should enforce.  The USPS opposes that motion and cross-moves for summary judgment.[3]  The USPS argues, as a threshold matter, that the Court lacks jurisdiction over the matter because Trenton Metro did not exhaust its administrative remedies through the grievance procedures of RI-399.  Moreover, the USPS submits that, even if the Court does have jurisdiction, the Court cannot enforce the Settlement Agreement.  The USPS reasons that the Agreement is ambiguous as to whether the parties intended the Agreement to include the modifications to the AFSM-100 and, absent specific language, those modifications essentially nullified the Settlement Agreement.  In addition, the USPS argues that the Court should exercise restraint in enforcing this Settlement Agreement because the dispute over the jurisdictional assignment to the modified AFSM-100 machines is the subject of a national dispute currently pending before the National Dispute Resolution Committee ("NDRC").  Finally, according to the USPS, Trenton Metro cannot seek monetary damages because it has not demonstrated any actual monetary losses.

On April 8, 2008, the Court ordered supplemental briefing in respect of the issue of Trenton Metro's claim for monetary damages.  In response, Trenton Metro submits its claim for damages comprises of compensatory and punitive damages and seeks an award of attorneys' fees and costs.

## II.    DISCUSSION

### A.    Standard of Review

---

[3]  Trenton Metro also argues that the Court refrain from reaching the merits of the USPS's cross-motion on the basis that the USPS untimely filed the motion according to the briefing schedule.  The Court, however, rejects this argument and considers the merits of both motions.

A court shall grant summary judgment under Federal Rule of Civil Procedure 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, *supra*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

**B.    Analysis**

      **1.    *The Settlement Agreement is Enforceable***

These motions require the Court to consider whether the Settlement Agreement between Trenton Metro and the USPS is enforceable.  The Court has jurisdiction over causes of action arising from a "violation of contracts between an employer and a labor organization representing employees . . . ."  29 U.S.C. § 185(a).  As such, the Court may enforce a final and binding settlement agreement that is "sufficiently specific as to be capable of implementation."  *United Mine Workers of Am. Dist. No. 5 v. Consolidation Coal Co.*, 666 F.2d 806, 810 (3d Cir. 1981); *United Mine Workers of Am., Dist. No. 2 v. Barnes & Tucker Co.*, 561 F.2d 1093, 1097 (3d Cir. 1977).  Alternatively, "courts will not attempt to enforce a settlement agreement that is too vague or ambiguous in its meaning or effect."  *Consolidation Coal*, *supra*, 666 F.2d at 810.

Moreover, courts should "avoid intruding on the bargained-for method of dispute resolution[.]"  *Id.* at 811.  As a result, when determining whether to enforce a settlement agreement, a court "must be able to say with positive assurance that the . . . settlement was intended to cover the dispute."  *Ibid.* (internal quotation marks and footnote omitted).  "If the court has any doubt, the parties should be returned to their grievance procedure and arbitration, for it is an arbitrator, and not the court, who is to decide whether the same issue has already been resolved in an earlier proceeding."  *Ibid.*  Therefore, the Court now must determine "with positive assurance" whether the Settlement Agreement intended to cover the dispute over staffing on the AFSM-100 and whether the Settlement Agreement is sufficiently specific as to be enforceable.

As an initial matter, the Court concludes that it exercises jurisdiction over this cause of action.  The USPS contends that the Court does not have jurisdiction because Trenton Metro failed to exhaust the grievance and arbitration process available under its collective bargaining

agreement with the USPS.  According to the USPS, Trenton Metro cannot bring a cause of action in respect of staffing on the modified AFSM-100 because that issue is pending arbitration before the NDRC, and Trenton Metro's collective bargaining agreement requires that it arbitrate all disputes with the USPS.  Trenton Metro, however, argues that it did proceed in accordance with the collective bargaining agreement when it brought its initial grievance in March 2003, which resulted in the Settlement Agreement now in dispute.  Trenton Metro submits that, as a result, it properly brought this action pursuant to section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and section 1208 of the Postal Reorganization Act, 39 U.S.C. § 1208.

The Postal Reorganization Act provides that "[s]uits for violation of contracts between the Postal Service and a labor organization representing Postal Service employees . . . may be brought in any district court of the United States having jurisdiction of the parties[.]"  39 U.S.C. § 1208(b).  Section 301 of the LMRA empowers federal courts "to adjudicate suits for violations of contracts between an employee and a labor organization."  *Consolidation Coal*, *supra*, 666 F.2d at 809.  As part of that authorization, a court can enforce "any means chosen by the parties for settlement of their differences under a collective bargaining agreement" provided the settlement is final and binding under the contract.  *Ibid.*  Although federal policy favors arbitration of labor disputes, it also favors "final adjustment of differences by a means selected by the parties."  *Barnes & Tucker*, *supra*, 561 F.2d at 1096.  Thus, "the absence of an arbitration award does not preclude judicial enforcement of . . . settlement agreements[.]"  *Id.* at 1097.

Here, the Settlement Agreement stated that the parties entered into the agreement in "full and final settlement" of the grievances filed by Trenton Metro pursuant to the collective

bargaining agreement in respect of staffing clerks rather than mail handlers on the AFSM-100.

Article 15 of the operating collective bargaining agreement provides for a Grievance-Arbitration

Procedure.  (William Lewis Affidavit Nov. 21, 2007 ("Lewis Aff. I") Ex. D).  That Procedure

authorizes supervisors and installation heads or designees to settle a grievance at each step of the

grievance procedure.  (Lewis Aff. I Ex. D at 91, 92-93, CBA Art. 15.2 (Step 1)(b), (Step 2)(c),

(e)).  Article 15 also clarifies that any settlement or withdrawal of a grievance at the second-level

of the procedure cannot operate as precedent "for any purpose, unless the parties specifically

agree or develop an agreement to dispose of future similar or related problems."[4]  (Lewis Aff. I

Ex. D at 93, CBA Art. 15.2 (Step 2)(e)).  Nevertheless, the parties also agree that they would

exercise good faith in reaching a "settlement or withdrawal of substantially all grievances . . . at

the lowest possible step" of the grievance procedure.  (Lewis Aff. I Ex. D at 100, CBA Art.

15.4.A).  Furthermore, the parties agree to arbitrate a grievance only if it is not resolved in the

four-step process.  (Lewis Aff. I Ex. D at 102, CBA Art. 15.5.A).

Pursuant to that language, the Court finds that the collective bargaining agreement

provided for a final adjudication of a grievance via a settlement.  Moreover, there is nothing in

the record to indicate that the Settlement Agreement is not final and binding.  The Court

determines that, to find otherwise, would render the Agreement without effect and would

contravene the parties' agreement to exercise good faith to resolve grievances via settlement

early in the grievance procedure.  Therefore, the Court holds that the Court has jurisdiction to

determine the enforceability of this Settlement Agreement because it is a "final adjustment of

---

[4]  Indeed, the Agreement in issue here states that it "is made on a non-precedent basis and can only be cited to effectuate this [A]greement."  (Gallagher Decl. Ex. B).

-11-

differences by a means selected by the parties." *Barnes & Tucker*, *supra*, 561 F.2d at 1096.

In addition, the Court holds that the pending arbitration before the NDRC does not preclude the Court from exercising jurisdiction over this action.  The present issue before the Court is limited to a contractual dispute regarding the Settlement Agreement entered at a local level involving only the Trenton facility.  Presently, the Court determines only whether the Settlement Agreement is entitled to enforcement as to these parties–a determination that does not necessarily involve the arbitration before the NDRC.

Having thus concluded that the Court may properly review the action under the LMRA, the Court now considers whether the Settlement Agreement covers the issue of staffing positions on the AFSM-100 and whether the Settlement Agreement is sufficiently specific as to be enforceable.  The Agreement confirms that the Trenton Inventory designates work performed on the AFSM-100 to five clerks.  In the event work load increases on the machines, the USPS can assign an extra position on the machine to a mail handler.  However, "[i]f reduction in work occurs, personnel will be moved in reverse order[;]" that is, the USPS must remove the mail handler from the machine before any one of the five clerks.  The result of the Agreement is that clerks will operate the machines, but a mail handler may operate the machine only if there is an increase in work.  Accordingly, the Settlement Agreement specifically covers the dispute of which craft has primary jurisdiction over the AFSM-100.  The Court, therefore, can conclude "with positive assurance" that the Settlement Agreement aimed to address the present grievance of the USPS's placing handlers, instead of clerk, in positions on the AFSM-100 machines.

Nevertheless, the USPS contends that the subsequent implementation of certain automated features—the AI System and the ATHS—to the AFSM-100 was not part of the

grievance addressed by the Settlement Agreement, and, thereby, the USPS can no longer abide by the Settlement Agreement.  Although the parties dispute whether they intended to incorporate into the grievance and Settlement Agreement the upcoming modifications of which the USPS notified the APWU, the Court need look no further than the language of the Settlement Agreement to conclude that the modifications do not nullify the terms of the Agreement.

The Settlement Agreement provides for the clerk craft to have primary jurisdiction over the positions on the AFSM-100 machines and that, in the event work requires less than six employees to staff the machines, the remaining positions on the machines will be staffed by clerk craft only.  Thereby, if there is a "reduction in work[,]" then clerks only operate the machines. Although the Settlement Agreement does not define "reduction in work[,]" the terms of the Agreement do not limit the method by which the reduction in work may occur.  That is, the Agreement sets forth a staffing procedure invoked by a "reduction in work" irrespective of how that reduction in work takes place.

In this instance, the modifications to the AFSM-100 resulted in a "reduction in work." The addition of the AI and ATHS automated features caused "a reduction of the AFSM[-]100 operating crew, [a] decrease[] in operation run times, and efficiencies in the preparation activities."  (Lewis Aff. II Ex. B).  As a result, the "reduction in work" caused by enhancements to the AFSM-100 machine trigger the Settlement Agreement's staffing reduction procedure.

Thus, pursuant to the Settlement Agreement, the clerks maintain jurisdiction over the stations in the AFSM-100 machines in the Trenton facility, irrespective of the enhancements. Accordingly, the Court holds that there is no dispute of material fact that the Settlement Agreement covers the dispute of which Trenton Metro now complains—whether clerks or mail

handlers have jurisdiction to operate the AFSM-100 machines—and is "sufficiently specific as to be capable of implementation." *Consolidation Coal*, *supra*, 666 F.2d at 810.  The Court further holds that the Settlement Agreement is entitled to enforcement.[5]

### 2.   *Trenton Metro Cannot Sustain its Claim for Monetary Damages*

Finally, the Court denies Trenton Metro's claim for monetary damages.  To support its claim for compensatory damages, Trenton Metro contends that it suffered three forms of economic loss: (1) the loss of new jobs caused by the USPS's improper staffing of the AFSM-100; (2) the loss of union dues Trenton Metro would have received if those new jobs had been created; and (3) the loss of overtime wages that clerks would have earned if they had staffed the AFSM-100 machines.[6]  In addition, Trenton Metro seeks an award of punitive damages.  Trenton Metro argues that punitive damages should be imposed against the USPS to deter it from disavowing binding agreements in the future.

The USPS opposes, contending that Trenton Metro's claim for damages is not founded on any actual loss sustained by the USPS's alleged breach of the contract.  In addition, the USPS argues that Trenton Metro is not entitled to recover punitive damages or attorneys fees.  Trenton

---

[5]  As noted by Trenton Metro, the USPS is not without recourse to change the jurisdiction of staffing on the modified AFSM-100 machines.  RI-399 expresses the intent of the parties to maintain jurisdictional assignments, but that, in the event the USPS seeks to change those assignments through an "operational change," the USPS must follow the procedures set forth in RI-399.  It may be that the ultimate result of following those procedures results in a change of jurisdiction from clerks to mail handlers.  Nevertheless, until the completion of those procedures, Trenton Metro is entitled to an enforcement of the Settlement Agreement, mandating the placement of clerks on the AFSM-100 machines.

[6]  According to Trenton Metro, the USPS reassigned two clerk positions on each of the three AFSM-100 machines to mail handlers.  There are three daily tours at those two positions per machine.  Trenton Metro submits that the result is the "loss" of a total of 18 clerk positions, at an average annual salary of $46,000.

-14-

Metro responds that the USPS, in its opposition, makes misleading factual representations and attempts to raise to new arguments in respect of the issue of breach.

Having reviewed the arguments raised and the accompanying affidavits and declarations, the Court concludes that Trenton Metro has failed to establish that it has suffered any actual economic loss caused by the USPS's failure to comply with the Settlement Agreement.  Under New Jersey law, "an inured party with the legal right to be compensated for the breach of a contract is entitled to the amount of damages . . . which . . . will put that party in the same position it would have been in if the breaching party had performed the contract in accordance with its terms, no better position and no worse."  *Magnet Res., Inc. v. Summit MRI, Inc.*, 318 N.J. Super. 275, 292-93 (App. Div. 1998).  *Accord Agathos v. Starlite Motel*, 977 F.2d 1500, 1510 (3d Cir. 1992) ("In a suit for breach of contract, the general purpose of the law is to place the injured party in the position it would have attained had the contract been performed."); *Totaro, Duffy, Cannova and Company, L.L.C. v. Lane, Middleton & Company, L.L.C.*, 191 N.J. 1, 12-13 (2007) (noting that, on claim for breach of contract, "[c]ompensatory damages put the innocent party into the position he or she would have achieved had the contract been completed").  As a result, "a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract."  *Totaro*, *supra*, 191 N.J. at 13 (internal quotation marks omitted). Although a court should not deny an award of damages based on the "mere uncertainty as to the quantum of damages[,]" the non-breaching party, nonetheless, bears the burden of establishing that the alleged loss was "a reasonably certain consequence of the breach[.]"  *Id.* at 14 (internal quotation marks omitted).

Applying those concepts here, Trenton Metro has not met its burden of showing that the

USPS's breach of the Settlement Agreement caused Trenton Metro to suffer any economic loss. Trenton Metro has not established that there is a causal relationship between the USPS's failure to assign clerks to the AFSM-100 machines and the USPS's failure to hire new clerks.  Rather, Trenton Metro admits that it suffered a decrease in Union membership caused by attrition and resignation of its clerk members.  Significantly, no clerk was fired or resigned because of the USPS's breach of the Settlement Agreement.  All clerks who had formerly operated the AFSM-100 machines were reassigned to new positions and, thus, did not loose any wages or cause Trenton Metro to loose any union dues.

The Court finds that the mere speculation that, had the USPS properly permitted clerks to work on the modified sorting machines, more positions would have been available for which the USPS could hire new clerks is too attenuated to establish causation between the breach of the agreement and any alleged loss of wages or union dues that might have been earned by or recovered from newly hired clerks.  In addition, the Court further finds that Trenton Metro has not established that "a reasonably certain consequence" of the USPS's breach is the loss of "overtime opportunities."  Indeed, Trenton Metro proffers no actual proof that any clerk lost an identifiable amount of overtime wages based on a reassignment off of the AFSM-100 machines.

Moreover, the Court finds that punitive damages are not appropriate in this action. Generally, "punitive damages are not recoverable in an action for breach of contract." *Local 127, United Shoe Workers of Am., AFL-CIO v. Brooks Shoe Mfg. Co.*, 298 F.2d 277, 282 (3d Cir. 1962) (footnote omitted).  However, an exception arises "where a defendant's conduct constitutes a breach of a contract and disregard of a duty imposed by law independently of contract." *Id.* at 282-83 (footnote omitted).  Trenton Metro does not seek to implicate this

-16-

exception.  Rather, Trenton Metro argues that punitive damages are necessary to deter future breaches by the USPS and to maintain industrial peace.  The Court disagrees.  The Court's present enforcement of the Settlement Agreement is sufficient relief for Trenton Metro, and punitive damages are inappropriate in this instance.  Similarly, the Court finds that an award of attorneys' fees is not appropriate here.

## III.    CONCLUSION

For the reasons expressed above, the Court grants in part Trenton Metro's motion for summary judgment in respect of enforcing the Settlement Agreement and denies in part in respect of its claim for monetary damages.  In addition, the Court grants in part the USPS's cross-motion for summary judgment in respect of Trenton Metro's claim for monetary damages, and denies in part as to its claim that the Settlement Agreement is not enforceable.  An appropriate order accompanies this Opinion.


/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: May 28, 2008